R. C.     M. P.   L. M. P.  M. P. R. M. O. R. M. P. R. M. P. R. M. P. R. M.  R.  O. R. M. O.        G. E. A. M. L. M. O. R. M. P. L. M. O. R. B. A. M. O. R. L. E.         R. R. E. E. R. R. E. E. R. E. R. E. E. R. S.    M. O. R. L. E.    R. E. R. E. R. L. L. E. O. R. R. R. E. O. R. O. R. R.   M. R. U. E. O. R. U. E.  R. U. E.  R. U. E. R. U.  R. U. E. R. U. E. R. U. E. R. U. E. R. U. E. R. U. E. R. U. E. R.   R. U. E. R. U. E. R. U. E. R. U. E.  U. E. R. U. R.  E. R. U. E.  E. R.  E. R. U. R. U. E. R.  E. R.  E. R. E. R. E. R. E. R. E. R. E. E. R. E. R. E. R. E. R. E. R. E. R. E. R. E. R. E. R.  R. E. R. E. R. R. E. R. E. R. E. R. E.  E. R. E. R. E. R. E. G.  E. R. E. R. E. R. E. R. E. R. E. R. E. R. E. R. E. R. R. E. R. E. R. E. R. E. R. E. R. E. R. E. R. E. R. E. R. E. R. E. R. E. R. But there's a heightened risk of abuse and in a situation like this where the parties being released are the ones determining the contribution and kind of driving the plan that suggests concerns about abuse or even in future cases, the idea that the parties who are getting the benefit of this release are determining how much they give how essential it's going to be to the plan. Absolutely right. If I could tackle, there were two things in there. If you don't mind, I'd like to address them both because they're actually so important. Number one is the question of, is there abuse? Now, when Metro Media talks about abuse, I think Judge Wiles quite actually sharp opinion in AG and Marine is quite helpful on this. What the second circuit was talking about was the abuse of overuse of third-party releases. And I think the court needs to be continuously diligent that the many guardrails and requirements that this and other circuits have set forth are continuously monitored, effect on the estate, jurisdiction, race, substantial contribution, etc. That really is what the court meant by abuse, which is, are they being overused? And we actually went back and looked at the 80 cases that we cited in our brief, all of them, because the government said that shows this is metastasized. What they didn't look at was how many of those cases have turned down third-party releases, which is more than half, about 55%, which means the court is not doing their job. Are you familiar with the mediation process that the judge and the counsel and attorney Feinberg went through? I am, Your Honor. I worked more than 12 hours a day on it for about a year. In that mediation, was the 4 billion, what is it, 4 billion point something? 4.325, Your Honor. Was that the factor's opening suggestion? So, Your Honor, I'm actually glad you asked. Let us stay with the question. Was that their opening suggestion for their contribution? So, Your Honor, with apologies, mediation privilege actually governs certain aspects of the mediation, but I think it's fair to assume that it was not their opening bid at all. There was a $3 billion publicly announced settlement on the day we filed Chapter 11 that also included 90% of the upside of all their foreign companies. It's fair to assume that it was mediation and counsel Feinberg who got the slackers up from their opening bid to 4 billion point 2. Your Honor, there were two mediators, Judge Lane Phillips and Ken Feinberg, who spent 11 months full-time all day every day. I'm just asking, is it fair to infer that it was the pushing of the mediators that got the slackers up from whatever their opening bid was to the eventual 4.2 billion? So, Your Honor, the mediators were one aspect of helping ensure that a proper and fair deal was reached in this case. No question about it. But as the record makes clear, this was the creditor's plan and the creditor's committee and 11 ad hoc groups of victims. This courtroom is full of them. Litigated opposite the slackers, there were hundreds of millions of pages of discovery produced. I get all that. And I just don't know why. I mean, I'm giving you what I think is a softball question, which you're standing there and letting go right over the plate. Judge Lee was concerned that the slackers, I think the word was determined. And what I'm suggesting to you and asking you, is it a fair inference that their opening bid was pushed up by the media? Your Honor, let me apologize for missing a pitch. What I was trying to convey, and I apologize, I obviously did it badly, is there were multiple rounds of mediation between both active judges and retired judges. Is it a fair inference that the mediators pushed the slackers up from their opening bid to 4.2? Now, either that's a fair inference or it's not. Your Honor, it is a fact that is set forth and described in the disclosure statement, which has an entire section of the history of negotiations. They then went up again after mediation before sitting judge. So the question, is it a fair inference? The answer is yes. Is that right? It is, Your Honor. Thank you. And just to finish answering your question, because the question of abuse and control is a desperately important one. And I want to give you comfort. Judge Newman's point, which I clearly missed, for which I apologize, is that we have multiple rounds of mediation before sitting and former federal judges who oversaw more than a year of full-time mediation to ensure the fairness and integrity of the process. But the reason I was struggling for a minute is that's only one of the things that ensured the fairness and the integrity of the process. Because we had all, virtually all, 50 state attorneys general, an official committee of unsecured creditors, and eight ad hoc victims groups engaged all day, every day in this case, over 300,000 hours of professional time poised opposite the slackers. Which is why this plan has universal support. The only appellees are the U.S. government, which is carved out of the releases, cut its deals, and got paid by the slackers already. When you say the U.S. government, are you referring to the U.S. trustee? Your Honor, the U.S. trustee is not an economic party of interest. You just referred to the U.S. government. Is it your view that the United States is dense with confirmation? Your Honor, the Department of Justice submitted a statement of interest before the district court that, in essence, took the same position as the U.S. trustee, which, frankly, many of us found to say the least shocking or confusing, given that their deal, pro-abatement and giving up almost all their recovery to state and local governments to save lives, is actually the cornerstone of the plan. They're putting in $1.75 billion, aren't they? They are allowing $1.75 billion that is coming from the slackers in these very settlements that otherwise would come to them as a planned distribution to go out to communities in desperate need of funds to save lives via our historic abatement structure. If the United States hadn't given up its $1.75 billion super-priority claim, the plan would not be the door to it. Well, Your Honor, we agreed to the $2 billion claim, which was done consensually in a settlement, in conjunction with a provision that they would give most of it back for abatement. That actually was the business deal, and we actually had to litigate to get that deal through because parties opposed it. It was a holistic deal where they were given a very large agreed claim, but then also agreed to give almost all of it back to save American lives and ameliorate the opioid crisis. Because the debtors announced on the first day of the case, and this is also just desperately important to me, we will not do a plan where the money does not go to save American lives. But without the give-back, there wouldn't be a plan, right? Well, I'm not sure, Your Honor, what deal we would have cut with the DOJ had the give-back not been part of it. It was a holistic negotiation where the agreement to the allowed claim and the $1.75 give-back were both aspects of a court-approved settlement agreement. But is it fair to say it's an integral part of the plan? Yes, Your Honor, it is. Let me ask a question. An individual has a personal injury claim against the corporation for addiction, and they live in a state that allows a direct action which imposes personal liability on a director or officer. They make a claim with regard to the addiction to the trust, to the appropriate fund, one of the seven funds that you created. All right. And what happens with regard to the direct action claims in those states where those claims are allowed? So, Your Honor, those direct action claims are exactly what is channeled under the plan. That is, in fact, at the core of what the third-party release is for. The Sacklers are paying in $5.5 to $6 billion, which is actually the money that is funding. The answer is the release, right? Their challenge, Your Honor, is the TDP is made clear. Both your claims against the Sacklers and your claims against Purdue are what constitute the basis for your recovery against the trust. It's just there's only one injury, so you measure the injury once. So the release runs to the Sacklers, releasing them individually with regard to direct claims that state law authorizes with regard to various activity of corporate officers. It imposes a direct personal liability on the director, for which reimbursement can't be sought from the corporation, but with the officer or director's amendment. So, Your Honor, I think the laws may be complicated as to whether reimbursement could be sought from the corporation and whether they could— That's why I said that it couldn't. I think that actually varies by state law. I understand that, but that's why I asked you only about the ones that couldn't. And so, Your Honor, I would answer it like this, getting back to our discussion about 10 minutes ago— You don't know the answer to that? I do know the answer. Oh, okay, good. The answer is that is exactly what's channeled. If the claims were owned by the company, we wouldn't need third-party releases. Well, any channeled claim is then—the Sacklers are released in personal liability, right? Yes, Your Honor. That's the nature—that's the cornerstone of the settlement that all the victim groups supported, as well as all the state attorneys general, which is the Sacklers pay in to the estate, and the claims against both the Sacklers and the company are channeled to the TDPs, the trust distribution procedures. It's actually a lot like the insurance company in Manville, interest-related, sort of paying in the entire proceeds to the estate, and then claims that could be either against the company or against the insurance policy go through the channeling structures. I mean, Your Honor, it's actually— There was a huge fight about a number of policies and layers of coverage, et cetera, et cetera, and travelers and a number of the other carriers finally reached a global settlement and created this fund, and the situation there was, in Judge Newman's case in the Garthering, you had a distributor, but the distributor's claims were going to be made against that fund. That was the asset that was going to be divvied up one way or the other. Right. But this is a little different. This is a state statute that imposes direct personal liability upon the Sacklers, and yet the Sacklers' claims are discharged because of the fact that they paid in to the debtor, and so state claims are being extinguished by a bankruptcy order, right? So, Your Honor, this is exactly like every third-party release case ever. In other words, parties have direct claims against third parties, and a settlement is reached because the bankruptcy estate is so deeply affected. And again, in most of those cases, it's only about a payment into the estate or it's about an insurance policy. Here, we actually have everything. The debtors have billions of dollars of insurance that the Sacklers are now walking away from. And the bankruptcy court order trumps the state cause of action because of the supremacy of the bankruptcy court? I mean, Your Honor, I believe in any case when a third-party claim is released, that claim otherwise could be prosecuted under either state or federal law. And so whether it's McArthur's claim in Mando 1, whether it's the securities law claims in Drexel, whether it's the hypothetical third-party claims in Metromedia, whether it's the breast implant claims in Dow Chorning, and this is another really important point. And they continue to grow, these types of cases. Well, interestingly enough, Your Honor, if you think back from a policy perspective, almost every mass court that has ever hit the bankruptcy system in every circuit in Atlanta was only resolvable through third-party rules. No doubt. The question is, how much can the bankruptcy court give to the Sacklers as it impacts individuals who have a separate independent claim against them for which somehow the Sacklers become insolvent because they play a vital role in solving this case? So, Your Honor, what I would say is, in the lead up to this— I'm sorry. May I answer? Oh, absolutely. And start to wrap up. We've let you go quite a bit. Sure. Absolutely. I thought I was only answering questions. I didn't mean to tarot. No, no. Your Honor, in Madoff, this court's exact words were, bankruptcy courts have authority, quote, to approve releases of a nondirector's independent claims. That was what you repeated and cited, too, at page 99 of Tronox. And you're right. That is out of Metromedia. Now, Your Honor, this court's view is, all of our cases to date rested only on 105, and a bunch of the other cases through the Supreme Court have cited 1123b6 also, because that's actually for a plan of reorganization. In fact, more closely, arguably even on point, because it says, a plan may contain any provision appropriate and not inconsistent. And the bankruptcy judges all over the code are given leeway, does not discriminate unfairly, is necessary, necessary through organization. Their adjectives are in about 40 places in the code that this type of discretion is the warp and woof of what the broad jurisdiction under Celotex and SPB OSIS and, quickly, your decisions, Tronox, Manville 3, Manville 4, are all about. And never before has a case like this happened where the entire case, for two and a half years, was only about the third-party claims. And that was mediated, litigated, and negotiated. And every group in the case needs this money to go out to save lives. Okay. We'll hear from you again on that rebuttal. So the next party we're hearing from, the Committee of Unsecured Creditors, is that correct? It is. Good morning. Speak right up. Please speak right up. It's hard to hear sometimes. I will. And you're Mr. Hurley? Yes. I am Mr. Hurley. May it please the court, my name is Mr. Hurley on behalf of the Unsecured Creditors Committee. The UCC was selected by the U.S. trustee himself to act as a statutory fiduciary for all produced unsecured creditors in these cases. And the UCC has faithfully discharged that role in the more than two and a half years since we were appointed. We can therefore say with confidence that the plan, far from being dictated by the Sacklers, is a creditor's plan. It reflects creditor compromises and advances creditor interests. The U.S. trustee is correct that the transfer-related claims are strong against the Sacklers. We know it was produced creditors who uncovered and developed virtually all of the evidence that the U.S. trustee cites. But litigation against the Sacklers would take years and tens of millions of dollars at least, and success, no matter how likely, is not guaranteed. In contrast, the settlement incorporated in the plan does guarantee that Purdue's claimants will receive billions in desperately needed relief in the near term and promote abatement and public health goals that could not be achieved outside of a consensual resolution. The settlement also is critical to the reorganization. Purdue's many creditors negotiated the 20-plus interlocking agreements that allocate value amongst creditors. Absent the Sacklers getting their reliefs, as Judge Strain found, all of those credit allocation agreements will unravel by their terms and lead to costly intercreditor litigation that itself could take years and cost tens of millions of dollars. As Judge Strain also specifically found, the estate cannot withstand the chaos, that kind of chaos, and a liquidation with literally no recovery by unsecured creditors would be likely. This is all the more so because in that event, the DOJ could assert the full amount of its allegedly $2 billion super-priority claim, which is more than some estimates of Purdue's entire enterprise value. Creditors in trial court for these reasons recognized that the releases at issue are not only important to the plan, they are absolutely essential. Even the U.S. trustee acknowledges that the plan would fail without the release. And no party ever identified at the confirmation hearing or before the district court any alternative to the plan that could result in successful reorganization. That's because there isn't one. Finally, it is estimated that an average of 200 people die every day as a result of the opioid crisis. Our plan ensures that billions in Purdue and Sackler assets will be used now to stem that tide and save and improve countless lives. No other outcome can achieve this result. It is that simple. We urge the court to reaffirm its holding in Metro Media, uphold the confirmation order, and let the creditors' plan proceed forthwith. Thank you. Thanks, everybody. Okay. So next we'll hear from the Ad Hoc Committee of Governmental. May it please the court, my name is Roy Englert. I represent the Ad Hoc Committee of Governmental and other contingent litigation claimants, which represents the interests of many states, municipalities, and tribes. After protracted negotiation and mediation, this plan received overwhelming creditor support. It will make billions of dollars available for opioid abatement. All of the voting states and territories have now consented to the plan and its third-party releases. Forty-two states voted to confirm it, and another nine have now withdrawn their objections. Allocation negotiations among the states began in 2018 and continued for more than two years, resulting in a consensual split of abatement funds. The states and local governments then reached agreement on abatement metrics and mechanisms, an achievement Judge Brain called incredible. As the Bankruptcy Court also found, as fact, the entire races of bankruptcy estate will likely be lost if this plan does not proceed, costing victims billions of dollars. I would like to turn to the text of the statute. Section 1123b6 provides that a plan may include any other appropriate provision not inconsistent with the applicable provisions of this title. It seems to me there are three operative words, any, applicable, and not inconsistent. Any means any. Not inconsistent has been covered by Mr. Huebner, and I would particularly commend his court's attention to Section 111b of the 1994 statute, which is codified. It's sometimes referred to as uncodified, but it's codified as a note to 11 U.S.C. Section 524. The word that does all the work is appropriate, and yes, this is a very broad permission to bankruptcy courts. Now, why shouldn't that worry the court? Let me say two things. One, there's an article by the great Judge Henry Friendly called Indiscretion About Discretion, which has been quoted by the Supreme Court of the United States. And Judge Friendly points out that Congress often gives courts very broad authority, but then it gets worked out by the common law method over time so that it is not a big deal. Why did it bother with 524g? 524g was meant to ratify this first Mandel decision. It was unnecessary. Under your theory, it's completely unnecessary. What did it do? So it just enacted it so everybody knew that they agreed with that one? Well, there was tremendous controversy over Mandel, as Your Honor is well aware. And Congress did want not only to ratify Mandel, but to put some very, very, very detailed procedures in place. And that's Congress's prerogative. It's a legislation to tail, but it's also Congress's prerogative, Judge Wesley, to legislate broadly, which is what it did in 1123b6. But with the very important qualification that the provision must be appropriate. Now, if ever there was an appropriate case, this unique mass court case is a case in which— Appropriate is defined by the circumstance or appropriate is defined by the underlying premises and limitations of the Bankruptcy Code itself. I mean, I'm not interested in the hype of whether the SACWIS dictated this or not. That doesn't interest me at all. What I'm interested in is whether the court has the authority to do this or not. And so, is it the substantial contribution that the third-party non-debtors make? That's part of it. But again, I'm standing here representing the states. Oh, wait. Don't get drawn into that. For heaven's sake. You're kidding. Why don't you let him answer my question? Well, he'll answer it after I finish. Please don't shoot yourself in the foot by saying it's the contribution of the SACWIS that makes this plan lawful. Don't do that. But when I start 112423b6, which said they can do anything appropriate, not inconsistent with applicable provision. So the burden is on the objectors to find an applicable provision that says the bankruptcy judge can't do this. And your position as you started is there is none. Yes. And the fact that Congress blessed the asbestos thing isn't a contrary provision because Congress said specifically draw no inference from our doing this. Yes. Draw no negative inference. Yes. So there is no provision on your view that says it can't be done. And that remains true whether the SACWIS put in 4 billion, 1 billion, or zero. Right? There's no provision of the code that says that can't be done no matter what the SACWIS contribution. But I do want to emphasize on behalf of the states the enormous amount of work that went into creating mechanisms for opioid abatement and why this matter is supported by, why this plan is supported by, essentially the unanimous view of the states, which is very unusual. Judge Wesley, I thought some of the— So absent a limitation, anything goes, I take it? No. This is why I brought up the friendly article. Well, Judge Newman was asking you, he said absent a limitation, anything else is appropriate. Anything else is not inconsistent. Again, I started by saying— Then what are the limits, then? The limits are worked out by courts over time in decisions like Metromedia and in decisions from other circuits. Counsel, start with the statute. It doesn't—you started with the word any, but it is followed by any other appropriate provision. Right? Yes. Doesn't the word appropriate have some meaning? Yes. Is it limitless? No, I'm going to ask you. I'm done. Thank you. Thank you, Judge Newman. Thank you. Thank you. All right. Next, I believe it's the counsel for the Raymond Sackler family. Mr. Joseph is next. Your Honor, we reserve the two minutes for rebuttal, because the issue we address is not the issue that Your Honor is going to consider. Okay. Thank you. We'll refer to you later. Okay. And the next party is the ad hoc group of individual victims. Is that— Yes. Okay. And you're Mr. Schor? I am. Okay. Again, Chris Schor from Wagon Case on behalf of the ad hoc group, which is a group of about 65,000 individuals that participated actively in the proceedings below, including in drafting the TDPs, which raised a question. And I'm happy to answer any questions you might have about the TDPs, but let me answer the question you asked, Judge Wesley. The TDPs are premised on one injury, one claim. That was a set of processes that were put in TDPs that were approved by the bankruptcy court without objection from anybody. The alternate rule in which we would try to determine 160,000-plus personal injury claims by allocating relative fault between the Sacklers and Purdue, completely unworkable. So the TDPs, one injury, one payment out, but to be clear, they are all being funded with the Sackler contributions, which are being made for both release of estate claims and direct claims. With the rest of my time, though, and this is going to sound weird for the victim's lawyer to say this, I want you to look past the craziness of what the Sacklers did here as officers and directors of this company and the damages that they brought on everybody. The key question that not only applies in this case but will apply in every future case is how do you solve the situation that Your Honor identified, where there are claims against the corporation and there are claims against the directors and officers for their participation in those acts. Those are the claims we're talking about. Those are the claims that were identified by Judge McMahon. Those are the claims that are raised in everybody's papers. Acts by Mortimer, Jr., acts by Richard Sackler, acts by Kathy Sackler, all taken while they were directors or officers of the company. According to the appellants, in this case and in every case in this circuit, the only way you can ever solve that problem is taking one of three approaches. One, you have to get the consent of everybody who has a direct claim. There are 300,000 creditors in Purdue. There is no way to get them all to vote on a plan, much less agree to everything. Two, you can have the directors and officers file for bankruptcy. The U.S. trustee points out that's what can happen. You have your whole board and officer slate file for bankruptcy in a case in which you're accused of participating in a securities fraud. Or three... It's particularly acute in a closely held corporation, obviously. Absolutely. Go ahead. And three, you litigate it to result. It leads to what I call an almost bankruptcy-like result in which the company continues to pay on D&O policies while that litigation goes on. The directors and officers get no comfort. There's no money funded to pay victims, and everybody loses. Is the injury the same being addiction as opposed to some other type of injury? Yes. Is that the nature of the reason for the one claim? Yes. Multiple theories against multiple parties, some of them non-debtors, many of them non-debtors, but it's one injury? One injury. In fact, in both the bankruptcy court and the district court, there were pleas to everybody involved. Please come forward and tell me about the claims you are concerned about that are being released. And what came forward were obvious escape claims. The Sacklers looted Purdue, walked away with all the money. Those are claims that the estate could settle without third-party releases. And what everything else that bubbled up and what Judge McMahon addressed specifically and what Your Honor raised today are claims against the D&Os for actions they took in directing the company to distribute products into the stream of commerce and injure people. Those are the claims we're talking about. They are inextricably intertwined, as Mr. Huger said, with the claims against the company. So third-party releases are what today has solved that problem. It allows the D&Os to waive their claims and contribution claims against the company and kick in money. It channels the claims to insurance or a fund, and it releases the debtors from the ongoing indemnification claims. If Your Honors are going to pass, that is taken away. That possibility no longer exists. There are no third-party releases. We would implore the court, as we have in our papers, to get to the question, then, of directing derivatives, to exercise your jurisdiction to look at this situation and say, in a world in which releases don't exist for the Sacklers, for this conduct, should it be a case in which 300,000 claimants? Each have their individual claims that they can pursue based on state laws. We'll have cases going in 50 states, all for the same conduct, and all trying to get to the same result, but for which the individuals will hold the payments for themselves, just as the nine states who didn't settle. They said, I have a direct claim. I'm going to take $300 million, approximately, for myself, but put it in my pocket and not share for anybody. That's not the result that bankruptcy should promote. The question that should be addressed, and I think based upon what we put forth in our papers, is the court can rule in a world in which third-party releases don't exist. Claims like this, there may be direct claims, but the debtor should have standing to pursue them. It leads to what Your Honor said in Tronoffs, which is it leads to an equitable result. Everybody wins. People will have their opportunity to participate. People can question whether the debtor's settlement is appropriate, but you can't leave a world in which nobody gets anything until the 300,000th person gives up their litigation, because that's the factual situation we're in. The stackers aren't funding until they get comfort on those claims. It's done pursuant to a third-party release. If a third-party release isn't available, it should be done pursuant to this court's existing direct derivative jurisprudence. It's been laid out and summarized most recently in Tronoffs. So unless you have any further questions, that's what we have. Thank you. And we thank you for your time. Thank you. Good morning. May it please the court. I'm Jeffrey Liesemer of Kaplan and Drysdale for the Multistate Governmental Entities Group, which represents the interests of over 1,000 local governments and tens of millions of their constituents. Local governmental entities are at the forefront of both opioid litigation and abatement efforts and will be critically affected by resolutions of the issues before this court today. First, 95% of the creditors casting ballots voted in favor of the plan containing the shareholder releases. Whereas Section 524G, by comparison, only requires 75%. This overwhelming support shows that creditors believe that the plan containing the releases best serves their interests. Second, it's hard to imagine third-party releases more important and essential to a reorganization than these. Two of the most important achievements of the MSGB group and other public creditors are, one, an agreed allocation of recoveries among incredibly disparate and complex creditors, and two, agreement to use the billions recovered from Purdue and Sacklers exclusively to abate the opioid crisis, bringing billions of lifesaving dollars to help those most vulnerable and in need. Those achievements likely would be destroyed if creditors could continue to sue the Sacklers for Purdue-related claims. This is because the available assets are dwarfed by the claims asserted against them. The public creditors' claims alone are in the trillions of dollars. Even if one significant creditor were not bound to the releases and got a judgment anywhere near its asserted claim, the Sacklers would not be able to make their agreed settlement contributions, drastically reducing or eliminating payments to all other public and private creditors. Thus, the releases are essential to protect the victims and creditors. Indeed, the trial court found at SPA 296 that the debtors would likely liquidate absent these releases, leaving victims with little or nothing. We ask that the confirmation order be affirmed. Thank you. Thank you. And the next party for the Mortimer side, initial coverage, Sackler family. Your Honor, I deserve my time for rebuttal as well. OK, thank you. I'll let you introduce yourself. Carl Cicerio for the Canadian creditors. I'm going to be focusing my time on the issues that are unique to the Canadian creditors, but obviously they crosscut on a lot of different things, including the court's power to impose the releases. The appellants in this case have largely attempted to minimize the significance of the Canadian creditors, but the court shouldn't be taken in by that effort. The Canadian creditors represent much more than a few isolated communities. They're the names represented in some classes that are likely to be certified in the near future. That would represent all 3,000 municipalities in Canada, all 600 First Nations in Canada. Can I actually have one question? Your argument regarding sovereign immunity, how did the releases implicate that? This is not a foreign sovereign being brought into court or held liable. I'm confused by that argument. Well, it is an instance in which our property is being adjudicated. Our rights and our property, that is our rights and causes of action that we have against the Sacklers and other shareholder release parties are being adjudicated. You're not being forced to be dragged into a U.S. court. You're not being held liable for something. It's the same as if we were defending the declaratory judgment. We are having our rights adjudicated as a defendant. Whether or not we are being held liable for damages doesn't matter in terms of sovereign immunity. It's a question of whether the court is exerting jurisdiction over us. But you're coming into this voluntarily. The court is not forcing you into this team. You voluntarily have been a part of this. Well, we filed a proof of claim in this case, and that's true of the individual representative claims that are here before you today, not the class. But when you file a proof of bankruptcy, that does not weigh claims of sovereign immunity. When it comes to immunity provided under FISA, the only way to weigh immunity under FISA is under FISA. 16.04 says that we go through 16.04 and 16.05 through 16.07 are the only ways, exclusive ways, that FISA immunity can be weighed. When it comes to the common law, immunity enjoyed by tribes, when they appear and provide and they enter an appearance in bankruptcy by filing a proof of claim, all they have done is consented to personal jurisdiction to adjudicate their claim. Enemy claims are counterclaims that might offset that claim. There is no consent or there is no waiver of sovereign immunity as to subject matter jurisdiction. And sovereign immunity is a matter of subject matter jurisdiction. And there is no waiver of other claims. You can't bring us into court in bankruptcy and then have other people adjudicate their rights against us. Maybe I'm disputing the idea that you were brought into this court in bankruptcy. You weren't brought in. You inserted yourself into this. We came to this bankruptcy to adjudicate our rights against the debtor. We never raised any issues against any of these shareholder parties. We never sued them. We never voluntarily consented to be sued or countersued by them. And one of the decisions that the appellants relied upon, S.G. Phillips says you're only waiving when you appear in bankruptcy issues related to set-ups. You're not waiving any other issues regarding subject matter jurisdiction or sovereign immunity or anything else. And so your rights against third parties are not an issue. You haven't introduced or allowed yourself to be sued by them, if that makes any sense. I want to return back to the issue of jurisdiction, the court's power to enter the releases. Because I think, Judge Wesley, your instinct is exactly correct. It's extremely problematic for these releases to be so broad because there's no contouring about jurisdiction. There certainly is probably jurisdiction to release some of these claims. But when you release all claims of all states without regard to whether or not there would be rights of contribution or indemnity by statute or anything else like that, you create a really big problem. And that's an especially bad problem for us because there's literally no connection to these states at all from our claims. There will be no rights to contribution and indemnity or insurance because they haven't established that there's an insurance policy that covers us. They haven't established that the rights of contribution and indemnity with regards to our claims against Purdue Canada, they're going to run to Purdue Canada. They're the joint torpedoes in that situation. And our Contribution Act claims, well, our Competition Act claims, for those contributions and indemnity and insurance are all permanently barred by Canadian law. There will be no recovery for those claims. There's no connection to these states there. And the court, as you suggested, Judge Wesley, it's also extremely problematic for them to say that, well, because they've got a right to withdraw the money if they're sued or there would be a cascade of events that would happen if there were to be a bunch of suits. That is an extremely problematic way of establishing jurisdiction because that establishes that there were effects on a particular plan. But then you have to leap from the plan to the estate and that is an indirect effect. That is a second order. If this happens, then another event happens and then other people do other things. And that's exactly the kind of attenuated indirect connection that can't establish jurisdiction under this court's precedent. Do Canadian plans possess direct claims against the Sacklers individually? So we have not filed any claims against the Sacklers directly yet. We've been prohibited from doing so by the imposition of the same here and there. But I'm talking under Canadian law. Under Canadian law, we can and plan to do, yes, exactly that. We plan to sue them both in their capacities of directors for Canada. We also plan to sue them under the Competition Act, which is a direct action against them individually, not in their capacities as officers and directors, but individually for their conduct in promoting opioid drugs in the United States. And under Canadian law, you say that with regard to those claims, they can't seek contribution or indemnification? With regard to the Competition Act claims, that's not just unlikely to happen. It's affirmatively barred under Canadian law on all three. There will be no contribution. There will be no indemnity. There can be no insurance coverage. Okay. Okay. Thank you. Thank you. Okay. I think we have your argument. Okay. Thank you. Thank you. And we'll hear now from the trustee. Thank you very much, Your Honor. Mike Shee for the U.S. Trustee. I want to zoom out to focus on the appropriate framework for assessing the statutory question. And that stems from the long line of Supreme Court cases making clear that Congress needs to enact a seemingly clear language if it wants to significantly alter the power of the federal government over private property, as it articulated most recently in CalPASTER. So under the planned proponent's view, the code authorizes bankruptcy courts to permanently extinguish causes of action, which are a species of property right, as the court made clear in Zimmerman-Brush. But no provision of the bankruptcy code expressly authorizes bankruptcy courts to adopt releases of this sort, as the court indeed remarked in Metro Media. So constitutional avoidance requires that the code be construed to prohibit the result that the planned proponents are asking for. And that's a very easy way of assessing statutory claims here. Now, the only response to this that I think the other side has come up with is not that avoidance doesn't apply or it's not that constitutional issues aren't at least deeply implicated. It's that the bankruptcy code speaks clearly. And I think Judge Newman was getting at this in his colloquy about 1123 v. 6. But the problem is the other side's interpretation of that statute just can't be reconciled with the way the Supreme Court has addressed these general provisions codifying bankruptcy courts' residual equitable authority, as the energy resources case on which the other side so heavily relies actually underscores. Energy resources makes clear that all of these statutes, whether it's 105, 1123, or whatever, all of these residual equitable powers derive from the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to, quote, modify creditor-debtor relationships. And in assessing statutes of this type, the Supreme Court has repeatedly rejected the idea that the code's general authority provisions are able to accomplish a result that is antithetical not only to the text of the code but to its structure, purposes, and history. Well, I think the other side's argument is that, in fact, this type of release would not be inconsistent with the code and that it's not, in fact, inconsistent with any express provision of the code. So maybe you could speak to that specifically. I will, Your Honor. There's two parts to your question, and I want to get at them in reverse. So the first question is, how express does the inconsistency have to be? And the other side would have you believe that it needs to be expressly forbidden by the bankruptcy code for there to be an inconsistency. And that just can't be right under cases like Javik, Law, and Radcliffe. So take Javik, for example. That was about the priority ordering that the bankruptcy code sets forth. Now, those priority orders don't apply to this type of order called a structured dismissal. So nothing in the bankruptcy code expressly prohibits a bankruptcy court from adopting a structured dismissal that violates the priority provisions. Nevertheless, the Supreme Court said in Javik that the priority provisions are so fundamental to bankruptcy that the general provisions granting equitable power to the bankruptcy court can't support the exercise of authority. Can I just jump in for a second? Yeah. Because to me, the Javik case is distinct from what's going on here. In that situation, you actually have something in the bankruptcy code that specifically says, this is the priority order, and it applies to certain circumstances. And yet, in that case, they're applying, they're basically, the bankruptcy court is saying, well, we know these are the standard priority orders, but because the code doesn't say we have to apply it to a structured dismissal, we won't. That's a clear inconsistency where the code is addressing a particular area in a very specific way about priority, and the court is actually, the bankruptcy court is saying, well, we know this is a priority, but we're going to divert from this because we think there's good reason, something general like that. Here, there's not some specific provision about third-party releases in the code where you can look at that, oh, this is some specific standard, and we're going to go away from that. It seems like a different situation in Javik because it's highly specific. And so, yes, what they were doing wasn't forbidden by the code, but it was addressed in a very explicit way. So, point taken, Your Honor, we disagree with that reading of Javik because, you know, as the other side would have it, there does need to be some express prohibition, but Your Honor's point is, I guess, slightly different, which is, you know, the sort of inconsistency was more specific because there we're only talking about, you know, the specific priorities framework, and here the inconsistency is much broader. But that makes the problem worse, Your Honor, not better. So, virtually every provision of the bankruptcy code is there to restructure the creditor-debtor relationship. That's all the bankruptcy code really talks about. And this court has held and the Supreme Court has held and other circuits have held that the whole point of bankruptcy is tailored to that relationship. And so it makes sense that the code was replete with statutory provisions directed to that relationship. It's not just the priority scheme that we're talking about now. We're now talking about, you know, as the other side said, the warp and weft of the entire bankruptcy code. And none of those provisions except one has anything to say about the release of a non-debtor's direct claim against another non-debtor. The one provision is arising only in the asbestos context and it doesn't apply to direct claims. It only applies to derivative claims, as this court explained in Manville 4. So, the inconsistency is, yes, you're right, Your Honor, it's a more general inconsistency, but that just underscores why the power asserted by the bankruptcy court was so remarkable and why that— I guess another way to look at it is if it's so general, how are you determining that there is, in fact, an inconsistency? So, it's not—it's a structural analysis, Your Honor, in the same way that the Supreme Court has relied on the similar structural intuition in Eugenic, Radletz, and Wall. So, you know, again, the Supreme Court says where we have a whole bunch of provisions that address a particular type of thing and no provision addresses the sort of thing that the bankruptcy court wants to do, but there's obviously a relationship between them, then, you know, that is antithetical to the structure of the bankruptcy code. And so that intuition applies with full force here. But it's not just a specific— So, you're reading of 1123d6 when it says not inconsistent with any actual provision. You think that means inconsistent with another provision that deals with a specific topic and inconsistent with any provision that doesn't deal with a specific topic. Is that right? No, Your Honor. We agree that appropriate has meaning. What we're saying is that the specific topic relevant to the question of a non-debtor release is indeed the topic of whether a discharge in bankruptcy can provide relief not only to the debtor but also to the non-debtor, and not only for derivative claims but also for direct claims. And so we disagree with the premise of the question that there is somehow some divergence between that fundament of the bankruptcy code and somehow that's irrelevant to the power that the bankruptcy court has asserted. But it's not just these general provisions, Your Honor, that the release offends. The release also grants the equivalent of a discharge to the settlers without ensuring that the settlers submit to the code's procedures for protecting creditors. So there's no reasonable dispute, for example, that if the settlers had declared bankruptcy themselves—they haven't— but if they had, the result would have been much different and the deal would have looked quite different. So the settlers would have ended— Excuse me. Didn't we say in Mandel I that a release was not a discharge? That was certainly part of Mandel I, but Mandel I doesn't sweep that far for two reasons. The first is Mandel I only addressed derivative claims, as the later cases in the Mandel line make clear. And the second is that in Metro Media, this court explained that indeed a third-party release could be the equivalent of a discharge. But, you know, just to go back to the inconsistency, if the settlers had declared bankruptcy themselves, they would have needed to account for all of their assets. They would have needed to put them in the bankruptcy estate subject to certain exemptions. They wouldn't have been able to obtain relief for claims for fraud and certain other forms of intentional misconduct. The other side doesn't doubt anything you just said. No, they don't. They don't— If they go into bankruptcy, the bankruptcy laws apply to them as a discharge creditor. They don't dispute that. Their argument is this is not a discharge. And you say, in effect, it's a discharge, right? Yes, Your Honor, but that makes the problem worse. It's not a discharge, is it? It is the same relief that a discharge grants. All a discharge—discharge is not a magical term in bankruptcy. All a discharge means is that there's a permanent injunction on bringing a particular claim. That's exactly what this release does. This release operates as a permanent injunction on bringing a particular type of claim. It extinguishes the claim. It permanently extinguishes the claim. It's a permanent defense against. Exactly, and that's exactly what a discharge in bankruptcy does. And so they say it's, well, not technically a discharge in bankruptcy. That's true, Your Honors, but that just underscores why this is so weird to try to say is consistent with the bankruptcy code. If the relief they're given by the bankruptcy court is identical to a discharge, but the bankruptcy discharge provisions emphatically do not cover the sort of relief that they've got, that is a tremendous assertion of power on behalf of the bankruptcy court that you would think Congress would have specified more clearly if it had intended the bankruptcy court to wield such authority. And, of course, notwithstanding the asbestos exception, which applies only to derivative claims, we're not aware of, and the other side hasn't cited a single example of Congress saying that in something like the 222 years in which Congress has been legislating in the bankruptcy space. But, you know, to return to that point about the relief that the Sacklers could have gotten in individual bankruptcy just illustrates why this case is on all fours with Jemmick and red lax law. By not declaring bankruptcy, the Sacklers didn't have to give up all of their assets, got broader relief, relief for claims for fraud than they would have gotten under bankruptcy, all under the umbrella of bankruptcy. And that's the sort of assertion of authority by the bankruptcy court that evades specific restrictions on what a discharge could do that the Supreme Court found so problematic. Where in the language of the release do you find the release for fraud? Sorry? Where in the language of the release do you find the release for fraud, fraudulent claims? So it's found in the definition of cause of action, Your Honor. And if you'll bear with me. I just want to make a note. Yeah, if you'll bear with me, let me find it in our brief. Yeah, so we begin discussing this on page 19 of our brief, and it continues when we discuss the changes to the release on pages 21 through 23. And so the operative definition of cause of action is any claim within the meaning of the bankruptcy code as well as any claim of any kind, character, or nature whatsoever. And that, to me, seems broad enough to encompass a claim for fraud against the Sacklers. So the other inconsistency to point out is with respect to 524G itself. When Congress enacted 524G, it specified that that was being enacted notwithstanding Section 524E, which, of course, states that a discharge of bankruptcy is for the benefit of the debtor. The other side has no explanation for why Congress would have wanted to include the notwithstanding language. As far as they're concerned, Congress didn't need to enact that language at all. And, indeed, Congress wouldn't have needed to enact 524G at all because, in their view, bankruptcy courts are traditionally wielded such power. But what do we—I mean, with regard to 524G, when it explicitly states, don't read into—don't assume or read anything into—from this, rather, about the bankruptcy court's authority, it seems like it's a wash. Like, how can you say, well, even though the statute has an explicit provision telling— we should still read into it? So it's not—because that overreads the rule of construction, Your Honor. All the rule of construction says is if courts believe that bankruptcy courts have always had this authority, then the enactment of 524G shouldn't restrict that. That, I think, is the best reading of the rule of construction. But Congress didn't take a view as to—in the rule of construction— as to whether bankruptcy courts have traditionally wielded that authority. And although the other side relies on pieces such as Katz that talk about the bankruptcy court's traditional authority at the time of the framing, they have notably failed to identify any framing-era example of a bankruptcy court reaching out to terminate a non-debtor's direct claim against another non-debtor. And we're not aware of any example of such historical power being exercised under equity, which is another reason why if a bankruptcy court is to exercise that power, one would expect Congress to have spoken quite clearly. And, of course, as Metro Media itself recognized, there is no express provision of the Bankruptcy Code authorizing the release in question. Is it fair to say that with respect to non-obsessive claims, Congress didn't speak one way or the other with respect to release? That's fair, Your Honor. It's difficult to parse because, again, Congress in 524G said that 524E is a bar. And so we should credit what Congress said insofar as Congress relied on the notwithstanding language. If Congress hadn't thought of 524E as a bar, it's hard to understand why Congress would have put in the notwithstanding term. But even if Your Honor is right that the Bankruptcy Code has nothing to say, the district court correctly held that the tie goes against the bankruptcy court's exercise of authority here. And that's true for two reasons. The first is, of course, the rule of construction that the Supreme Court articulated in cases like CalPASTER that requires an exceptionally clear statement of congressional intent. And second, the fact that in JEVIC, the Supreme Court said to the extent that the bankruptcy court wants to assert a power that is inconsistent with the structure, purposes, or text of the Bankruptcy Code, there needs to be much more than congressional silence. I mean, isn't that the whole issue, though? Whether or not, in fact, this is inconsistent with the Bankruptcy Code. And we know that there's no explicit provisions addressing that. That's the whole sort of issue here. So, Your Honor, if you don't think that there's any inconsistency with the Bankruptcy Code, then, of course, this difficulty, that's going to be hard for us to overcome. Right, but I guess what I'm saying is, point me to the thing that shows there's an inconsistency. If you haven't agreed that the inconsistencies that we've identified here are not inconsistencies, then Your Honor has a very specific understanding of inconsistency that just can't be squared with how that is used in normal parlance. Because inconsistency doesn't mean inconsistent with just the expressed terms of a statute. Imagine a plain language example. A library says, members can only borrow books for two weeks, and that's all. And then so a nonmember marches in and says, well, I'm not a member, so I can borrow books for as long as I want. I think everybody would go, well, that's a little bit weird, notwithstanding the fact that the rule for the library doesn't have anything to do with what nonmembers can or can't do. And so that's analogous to the sort of inconsistency that's present here, where a non-debtor says, I can get the benefit of a discharge, and the bankruptcy gets to grant me the equivalent of a discharge, a permanent injunction, as Judge Wesley has pointed out. But I don't need to comply with any of the rules of the bankruptcy code, and I don't need to contribute all of my assets. And by the way, the permanent injunction that I'm getting is broader than the permanent injunction I would have been entitled to had I declared bankruptcy myself. That's the fundamental inconsistency here, and the fact that it's not just with limited provision, such as the priority scheme, makes the problem worse and not better, Your Honor. And so, you know, to the extent that— Is it your position that there cannot be a lawful release of the sort in this case unless Congress explicitly authorizes such a release? Yes. That's your position? Our position is that if Congress has not expressly authorized the release of a direct claim of a non-debtor against another non-debtor, then a bankruptcy court lacks authority to adopt a plan that contains a release of that sort. An express congressional enactment such as 524G, except applicable to direct claims and not just derivative claims, that's the sort of thing that would be required before a bankruptcy court, or any court, could exercise authority in bankruptcy to do something like that. And the new process— Go ahead. No, Your Honor, I did not mean to interrupt you. Oh, I thought Judge Lee had a question. No? Am I wrong? No, no, no. It's very hard to hear you, Judge Newman. Oh, okay. I'll try to do better. I'm not sure counsel wants me to, but I'll be glad to try. I'll try to get the volume up. What, in your view, will happen to the existing and potential plaintiffs if the plan is not consented? So, I'm glad for the opportunity to address that, Your Honor, and I want to make something very, very clear. The U.S. trustee fully recognizes the pain and suffering that the opioid crisis has caused. And the U.S. trustee agrees with the district court that the proposed plan with these contours could provide a lot of things that are very good to a lot of people. But those don't bear on the core legal question, which is whether the release is constitutionally sound or statutorily authorized. And moreover, these predictions about what will happen if the district court is affirmed are speculative. So, for example, the bankruptcy court approved the plan, based in significant part on representations that it was the best plan, and based on, it seems, significant efforts by the mediators to extract the best plan. And that led to a $4.3 billion contribution by the Sacklers. But once the district court vacated the plan, the Sacklers agreed to contribute an additional $1.something billion more, which was not on the table until the plan was vacated. So these suggestions that everything is going to fall apart are a little hard to credit. But even if the Sacklers decide to take their proverbial ball and go home, that doesn't mean that no plan can be confirmed. So, for example, the estate has billions of dollars in fraudulent claims against the Sacklers that presumably the estate could pursue if it chose. The states and plaintiffs could recover from the various lawsuits against the Sacklers that the bankruptcy court put on ice, and more people could file lawsuits, such as, presumably, the Canadian municipalities, whose ability to file lawsuits has been predetermined by the injunction that the bankruptcy court put in place. Where would they sue the Sacklers? I don't know, Your Honor. You'll have to ask the Canadians about that. But the point is, to the extent that the Sacklers protest... ...their money is in the bail of the jury. That's right, Your Honor. But these representations about the value of the claims are also a little bit hard to credit. So at the confirmation hearing, the debtors specifically said that the merits of the district courts, of the direct claims against the Sacklers and the other released parties were irrelevant. I think one illustrative statement is on page 806 of the SPA, where they said, we chose the train that we're riding, and the train we're riding is not the merits. At the bankruptcy hearing, they never analyzed the value of the claims. They never retained any experts to value the claims. They didn't invite or receive any presentations from potential plaintiffs with such claims. So it's hard now to say, well, you know, the claims are essentially worthless. And they also emphasize how successful the Sacklers have been, as Your Honor has said, at shielding their assets from recovery. But that's also difficult to square with the Sacklers' own behavior, where they agreed to pay a billion dollars more to get these releases after the release was vacated to try to make these losses go away. So it's difficult to understand how, in light of the absence of anything in the record about the value of these direct claims against the Sacklers, and in light of the Sacklers' willingness to pay an extra billion dollars just to get the release to try to make the losses go away, that the fact that some of their assets may make the Sacklers hard to collect against makes the claims that the non-betters have against the Sacklers worthless. But your view is that if that doesn't— I'm sorry. I was just going to say, but your view is that that doesn't really— even if the Sacklers were putting in $10 billion, your view is still that these releases are bad and the deal can't go through. That's right, Your Honor. But I understood Judge Newman's question to be focusing on the equitable components of this. And the sole point— What claims against the Sacklers could be released, then? Only the claims held by the estate? So the claims that are not—the releases that are not at issue here, Your Honor, are the derivative releases. So releases of the sort that were approved in Mandel 1, such as against the proceeds of an insurance policy that was basically property of the estate. The trustee has not contested the propriety of that sort of release, and we don't understand any of the objectors to be focused on that either. So that would certainly still survive an affirmance of the district court's holding. But the sort of thing that can't be released is exactly the sort of claims— Indemnification claims they might hold against the debtors should they themselves, as corporate directors, be passed into liability of where they have the right to indemnification? Who is— The Sacklers. Could they be released from that? I'm not sure, Your Honor. I think the way we would think about it is whether that is a claim belonging to the estate. One of the problems with this is it seems like a hypothetical. There's no definition to this. That's why when the victim's counsel stood up, it was helpful in some ways to put some definition to it. And his view was there's one injury. I understand it. That's exactly what happened. That's MacArthur. That's exactly MacArthur. Because there was an exposure to asbestos by a product that MacArthur sold that Manville made. So it was all contained within that. And that's why that—recognizing the importance of the insurance policy and the insurance coverage, and Judge Newman analogized to claims against the common res for which people could make. That makes perfect sense to me. But it's hard to conceptualize how this plays out as inappropriate beyond the bankruptcy court's authority without putting the actors together because they're so fact-specific in some times. And that's why I continue to ask questions about the state direct claims. Yes, Your Honor. I asked your Canadian colleague there, representing the Canadian claimants, to respond to that. So, I mean, these are—these are claims that you premise exist but have no—no one's definitely asserted because of the injunction, right? No, Your Honor. So there's two sort of sets of claims that could be fit into an answer to you. The first are all of the claims that already existed brought by a lot of the states, for example, that were put on ice but had survived motions to dismiss. Unfair business practices. State False Claims Act cases or something along those—so those all survived motions to dismiss, as I understand it, on the basis that they were actually derivative claims and not direct claims. And our brief sets out a couple of instances of cases surviving motions to dismiss on that basis under state law. So that's one category of claims that would be erased permanently by the release that would be able to go forward under the district court's order if that's affirmed. Another category, of course, is claims that haven't been brought in virtue of the injunction that have been in place. And to the extent that they likewise assert direct liability on behalf of the settlers, then those too would be permanently extinguished, but individuals would be able to proceed on them to the extent that the district court is affirmed. But, you know, to your point that there's essentially one injury, that's potentially true as a factual matter in some of these cases, but the fact is we just don't know because, as Your Honor has pointed out, that is a necessarily fact-specific inquiry. And the point of the release is that it pre-permits any such inquiry. Nobody gets to go to court to try to test whether their claims are sufficiently overlapping. And, Your Honor, even if the claims were sufficiently overlapping, that wouldn't solve the constitutional problem because, you know, as Your Honor is quite aware, it's just a fundamental principle of court law that even though you may suffer one wrong at the hands of multiple actors, you have an individual claim, an individual cause of action against all of the actors who have injured you. And if that cause of action, that property right under Zimmerman-Brush, which is being permanently terminated by the Sackler release, and that's something that there must be a clear statement from Congress before a bankruptcy court can assert that authority. And I want to close by underscoring the importance of that constitutional question, which didn't get a lot of airtime in the presentation of the other side. Can I just—I'm sorry to jump in. It's related to this, the constitutional question. I guess I'm wondering how the constitutional problem you see here in terms of extinguishment of property rights and claims, how does that not also apply to 524G? Is that unconstitutional? No, Your Honor, and that's true for two reasons. The first is, Congress enacted 524G, and— Well, Congress can't go against the Constitution. That's right, Your Honor. But as the Supreme Court and other cases have held, Congress's rearrangement of the economic relationship between actors is subject to rational basis review. But the reason that's true is because the Constitution vets authority in Congress and Congress alone to make decisions about how to balance the countervailing policy interests, and the heightened procedures in 524G, which, by the way, were not followed here, only underscore the extent to which Congress took seriously those constitutional concerns. Here, Congress has not acted. And so for the bankruptcy court to assert the authority to just copy-paste provisions that might be constitutional in the limited context of derivative claims in asbestos bankruptcies and say, well, we think that these provisions are good enough in this context for direct claims in non-asbestos bankruptcies, that's a key separation of powers problem, and nobody in this case has cited any authority for the bankruptcy court to craft remedies that is a power traditionally aggregated by the Constitution to Congress and Congress alone. I see my time has expired, but— Counsel, I just want to ask one short question if I may. Is there any finding of facts made by Judge Drain that you think is clearly wrong? Yes, Your Honor. So if this court holds a number, can you do it by numbering it to save us time? I'm sorry, Your Honor, I couldn't hear the second part of that. Could you identify them by their numbers just to save us time? I'm sorry, not off the top of my head, but I can tell you the categories. The first are Judge Drain's findings with respect to the Metro Media standard. So to the extent that the court believes that the Metro Media standard controls, which it does not, Judge Drain made certain findings. Did he directly interpret in Metro Media? Oh, no, no, no. Judge Drain said Metro Media adopted factors that a judge must find for a release to be approved. We disagree with that reading of Metro Media, but to the extent that this court agrees with Judge Drain that Metro Media controls, those findings are clearly erroneous for the reasons we set forth in our brief. Moreover, we disagree with Judge Drain's findings with respect to the constitutional issues. Judge Drain found, for example, that notice was sufficient, but for the reasons set forth in our brief, the fact that the notice may have gone out to a lot of people does not mean that the quality of notice was sufficient to put those people on notice of what this plan was going to do. What it said as opposed to who saw. Absolutely, Your Honor. And so there are a number of other factual disputes that we raise in our brief related to, for example, the necessity of release to the plan and so on. So please don't take the response from the podium as being the exclusive source of the disputes that we have with the findings of fact from the district court, from the bankruptcy court, rather. But the point is there are several important disputes that the trustee has set forth with the reasoning of the district court's findings of fact. Okay. All right. No other questions. Thank you, Mr. Sheehy. Thank you very much. Thank you, Mr. Sheehy. And now we're ready for rebuttal from Mr. Huebner. Your Honor, one side of the fact, before I begin, just procedurally. Sorry, I apologize. One side of the factor says he did their two minutes. To me, they don't intend to speak. I think the other has not. So I think if it's okay, I have six minutes. Okay, that's fine. Yes, thank you. Your Honor, we just heard a great many things from the U.S. government that are extremely surprising, to say the least. I think most importantly, a lot of the argument you just heard assumes that 34 years of Second Circuit precedent is either illegal or unconstitutional. And the majority of circuits in this country have been violating both the law and the Constitution for decades, none of which is true. Just to answer your first question, why was 524G needed? There's a very precise answer. The managing trustee of the Johns Manville Personal Injury Trust went to Congress and said, for every dollar the stock price goes up, the trust gets another $100 million. Can you please clarify to leave no doubt that the trusts are locked solid? And in light of that testimony, Congress agreed to pass the specific statute. Number two, Your Honor, with respect to inconsistency, which we heard a fair amount of argument about, let me remind the panel, if I may, that at page 64 of the government's brief, they concede it is their burden to prove inconsistency under a hard edge, not ours. That burden most assuredly has not been carried. In response to many questions from this panel, they retreated, again admitting time and time again that they actually could find no inconsistent provisions, but that it was a gestalt. So let's first talk about what the cases actually say. What Robbie Siegel, which he relied on, actually says is that 105, which is actually not the section implicated here, can violate the quote, quote, express terms, close quote, page 422, quote, explicit mandates, close quote, page 421, and quote, specific provisions, close quote, at page 421-22. That's no doubt true, but it also can't violate the due process clause in the Constitution of the United States. Your Honor, I agree completely, and with that, let me turn to Jevick and Energy Resources. What Jevick said was that the destruction of dismissal there because a permanent final disposition of the debtor's assets in radical violation of the priority conducts of the Code violated the Code's quote, first principle and most important and famous rule, close quote, and violated the procedure's quote, specified by the Code. Jevick v. Siegel and law, sorry, law v. Siegel and Jevick support our side entirely. Your Honor, with respect to sovereign immunity for the Canadians, we'll largely rest on our papers except to say four very quick things. Number one, their class is uncertified. They represent less than 1% of the population of Canada. Number two, we settled with all of the provinces of Canada and did a huge carve-out of all Canadian claims, and everyone else in Canada, including provinces representing the entire population, was satisfied. Three, in response to your question, Your Honor, there was no answer. Section 106 for 18 years has been found by every court to ever breach the issue to trump the Foreign Sovereign Immunities Act, and, as he admitted upon questioning, but not quite, this court's own decision-filled constructors expressly said, you file a claim, you quote, necessarily submit to the bankruptcy court's equitable power. That's at page 707. To hear him represent to this panel that their claims are unrelated to the debtors is completely shocking, given what his brief actually said, and I quote at page 62, the claims are, quote, based in part on allegations that the SAFRs acted through the debtors, using them as an instrumentality to commit Canadian fraud. Simply stated, they retain all their claims against Purdue Canada, just like everyone in Canada does. The only thing that is released are claims that relate to the debtors. Your Honor, with respect to the arguments made by the U.S. Trustee, let me tip them down very quickly. Number one, the authority to modify debtor-creditor relationships, expressly lauded in energy resources, sometimes in rare cases requires the resolution of third-party claims that are inextricably intertwined. That is not intuition. Those are the findings of fact of a trial court that heard 41 witnesses, and it's actually pretty amazing to hear the appellate expert from the DOJ testifying to his court about what he believes will happen. I'm not sure where the belief is from, because we had a trial, and here's what the undisputed findings of fact of the trial court were. The debtors would likely liquidate. Unsecured creditors would likely receive nothing instead of more than $6 billion, and insurance and identity claims would be massive. To hear him say, here's what we dispute factually is unbelievable. The district court said in the middle of the appeal, the facts of this case are totally undisputed. Does anyone disagree? She actually said it twice, and there was no response. Connecticut was up at the podium at the time, which is why the district court opined, in her opinion, at page 81, footnote 54, no one has challenged any of the findings of fact. He wasn't there, and it's not true. She also said it on page 6. The bankruptcy court's fact of quote, essentially unchallenged. That's not the trial court. That's the district court. Your Honor, on to some of the other questions that were asked. There is no inconsistency. You asked and asked and asked, and the Second Circuit, the Third Circuit, the Fourth Circuit, the Sixth Circuit, the Seventh Circuit, and the Eleventh Circuit have likewise found no inconsistency. Energy resources create incredibly broad authority to modify credit relationships. Here's a little known interesting fact. Energy resources, in fact, was kind of a third-party relief case. You can't tell it from the Supreme Court's opinion, but I'll tell you what actually happened because it's in the bankruptcy court opinions and the briefs. The officers, directors, the debtors wanted to settle with them, and they said pay money into the estate and facilitate the reorganization. And the DSNO said, we'll only pay if you pay the IRS in the order we like that lets us off the hook for our responsible person liability under 6672. And the court put it in the plan. And then the IRS said, are you insane? You're going to order the IRS over its objection in what order to apply the debtor's tax payments to benefit officers and directors who paid money into a bankruptcy estate? And guess what the Supreme Court said? They said yes. And that's why both Erdogan in the Seventh Circuit and Gaff Cordy in the Sixth Circuit expressly rely on energy resources for third-party releases. This court created the whole doctrine before 524G was enacted because the world needed it. And virtually everyone has adopted it because when you get to mass courts like this, the money for the victims is often up at the parent companies. Your Honor, another factual finding that clearly counsel is unaware of is that Judge Strange found as a matter of fact that more discovery was provided in this case than any case he has seen in his, I think he said, 34 years as a lawyer and judge. And more than the Sacklers would have provided had they been in Chapter 11. Another fact that he appears not to know is that the majority of the Sacklers' wealth is not in their own name. It's in trusts, many overseas, that are not bankruptcy eligible. So the fantasy in their brief, which is nowhere supported by the record and is in derogation of an extensive trial with 41 witnesses, is that we got more discovery, more money, and more transparency than any other. Your Honor, Judge Westley, you asked several times about fraud, and I will be very upfront about it. Are claims for fraud released? Yes. That's what they're paying $5.5 to $6 billion to the joint creditors because that is your copy with the PI. It's all joint creditors. You have to be a claimant against Purdue, or your claim against the Sacklers is not released. And that's why the Canadian carve-out worked with the real representatives of Canadian's population. Because if they have claims directly against Purdue Canada. Let me ask you a question. If someone has a claim against Purdue also has a claim because one of the Sacklers, unfortunately, crossed the center line and struck them, so it's a completely different separate tort. But they have a claim against Purdue also. Is that claim the personal injury claim released? The answer, Your Honor, as it is we know. And that's the point. The original use of derivative in Manfold I, and this is why it is a little bit analytically confusing, is derived from the conduct of the debtors. Our releases are tied exclusively to opioids and to the debtors. Yeah, that's the one injury theory. And to the debtors' conduct. And in fact, the idea, the fact patterns were engaged. Again, counsel just wasn't there at the time. There were extensive quality reports, both the bankruptcy court and the district court, ensuring the fact pattern much stronger than yours, which is. That's why Drain amended it 10.7 to say legally relevant. Exactly, Your Honor. And it already only limited opioid claims. And the example was exactly that one, which in fact, strangely enough, in Judge McMahon's prior decision, that came out exactly the other way. If you read her Kirwan decision, it types about 140 cases and comes out the other way on every single issue from her decision here. She went to that exact fact pattern in Kirwan and Carta and narrowed the releases as Judge Drain did also to be 100% sure not only your fact pattern, Your Honor, but a closer one. What if Susie Sackler, that was Judge McMahon's case. I'm sorry, I couldn't hear you. What did you say? What Judge McMahon asked in the hearing was, what if Susie Sackler sold Oxy to her roommate out of her dorm room? Is the mere fact that it's Oxy, so you could say it's Purdue? Answer, not within the ambit of the releases, because it doesn't involve the debtor's conduct and it's not a legally relevant cause. Now, just a couple of final points, because the U.S. Trustee said so many things that are troubling. Just in response to your question about the rule of construction, I'm not sure where the gloss on the rule of construction came from, but it is totally clear on the face that it forbids exactly the 524G analysis. If you look at the Supreme Court decision in Verizon, the Supreme Court literally said, I want to find X. It's clearly the right answer under the statute, but the rule of construction there, which was identically worded, bars me. Here, there's no reason to want to find anything they're asking for, because it will result in the death and suffering of thousands of people and the destruction of a plan that every creditor in this case worked for years to build to ensure a life-saving outcome. Now, just one final thing, if I may. We also heard some testimony about the fact that he doesn't believe or is not sure that the claims are intertwined. Not one, but two judges already found that to be untrue. Judge McMahon's prior decision in Dunaway, which was about the preliminary injunction, expressly addressed this. Judge McMahon's decision below on appeal expressly found the claims congruent, pervert, and totally intertwined. And Judge Strange surveyed the complaint and actually found as a matter of fact that the claims were intertwined and inseparable. And that's the whole point. It's not only that we would lose billions of claims against the Sacklers in this fire tornado of thousands of litigations where we're competing against our own creditors for years to overcome the Sacklers. It's not only that the 24 inter-creditor deals that obviated years of fighting among creditors about who is entitled to what. It's not only that our insurance, which now is 100% ours to get and give to innocent victims and save lives, would instead be in a war with the Sacklers, who have dozens of entities that are beneficiaries. It's actually the estate itself. Even the company couldn't survive the firestorm. And so the debtor's conduct is always at the core. The debtor's very reorganization is at the core. Judge Newman asked counsel, what is the alternative? The answer was an appellate lawyer saying, you know, like maybe we could all litigate for a long time and there would be a better outcome. There is a trial about this. They are not an economic party. They won't die if they don't get funds for abatement and remediation. But the client of everyone else in this courtroom is at risk of doing exactly that. Four years of my life have been devoted to doing the best I can for the victims of Purdue to get them the most money, fair abatement, and victims to save lives. The notion that we should gamble that an alternative, that two estate fiduciaries and 11 groups spend years exploring every pathway because they think it sort of might violate their vision of the gestalt of the code because they have some generic cases that say, normally bankruptcies about the debtor is an insult to 34 years of Second Circuit precedent as well as the victims in this case. Well, I think I will leave it at that and let the panel ask questions. Thank you, Mr. Huber. I believe there's still one appellate who has not argued yet. That's a hard act to follow and I won't take long. Laura Monahan on behalf of the Mortimer Side Initial Coverage SACWIS parties. I just wanted to address one discreet point that Judge Lee had raised, which I think went to the question of what the SACWIS role was at Purdue at the time that these releases and contributions were negotiated because it would be troubling if a party got to be on both sides of that transaction and, in fact, determine their own fate. And I wanted to note that that was absolutely not the case. The last SACWIS left the board of Purdue long before Purdue filed for Chapter 11. Judge Drain actually appointed an independent examiner to look at the question of whether the SACWIS had exerted any influence over Purdue in the arm's-length negotiations and concluded that they didn't. These negotiations were overseen by eminent mediators who had a very strong view. To answer Judge Newman's question, it certainly was not the SACWIS opening bid by any means that ended up being the amount. And then, of course, it was all subject to a very thorough scrutiny by the court at the confirmation hearing. So that's all I wanted to say, just to make sure that was clear. Okay, thank you. Thank you, Your Honors. And so I think we've covered all the parties now. Thank you, everyone, for your arguments today. And thank you to all of our court staff for making everything run smoothly. With that, we'll take it under advisement, and I'll ask the defendant to close the hearing.